IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | | |
|---|---|---|
| WILLIE WINTERS | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | CASE NO.: 7:21-CV-157 (WLS) |
| | : | |
| BRYANT, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## <u>ORDER</u>

Before the Court is Defendants Delisha Bryant, Pamela Nisen, and Tina Starling's ("Defendants") Motion for Summary Judgment (Doc. 38). Therein, Defendants move for summary judgment on Defendants' Eighth Amendment Deliberate Indifference to Serious Medical Needs claim.

## I.    RELEVANT PROCEDURAL BACKGROUND

Mr. Willie Winters ("Plaintiff") commenced the above-captioned action on December 15, 2021, by filing a Complaint (Doc. 1) alleging two (2) causes of action. The Complaint (Doc. 1) alleges a deprivation of Plaintiff's Eighth Amendment civil rights pursuant to 42 U.S.C. § 1983 and a state law medical malpractice claim. (Doc. 1). Plaintiff seeks compensatory damages and attorney's fees pursuant to 42 U.S.C. § 1988.

On February 23, 2022, Defendants filed a Motion to Dismiss (Doc. 8) Plaintiff's state law medical malpractice claim, which the Court granted on April 26, 2022. (Doc. 15). Defendants then filed an Answer on April 28, 2022. (Doc. 18).

On June 23, 2023, Defendants filed a Motion for Summary Judgment (Doc. 38).[1] Under Local Rule 7.2 a party has twenty-one (21) days after the service of the movant's motion and brief to submit a Response. Plaintiff, therefore, had until Friday, July 14, 2023, to submit a Response to Defendants' Motion for Summary Judgment. Plaintiff has failed to do so. As

---

[1] Defendants moved for, and the Court granted, a motion for leave to file excess pages for their brief in support of their Motion for Summary Judgment. (*See* Docs. 37 & 38).

such, even absent Plaintiff's Response, Defendants' Motion for Summary Judgment is fully briefed and ripe for ruling.

## II. MOTION FOR SUMMARY JUDGMENT STANDARD OF REVIEW

### A. Legal Standard

Under Fed. R. Civ. P. 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).[2]

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "'A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.'" *Grimes v. Miami Dade Cnty.*, 552 F. App'x 902, 904 (11th Cir. 2014) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000)). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.

---

[2] Pursuant to Local Rule 56 the movant for summary judgment shall attach to the motion a separate statement of the material facts about which the movant contends there is no genuine dispute to be tried. M.D. Ga. L.R. 56. The respondent shall attach to their response a separate statement of material facts to which respondent claims there exists a genuine dispute to be tried. Here, Defendants have complied with Rule 56.

1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the non-moving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of showing, by citing to the record, that there is no genuine issue of material fact. *See Celotex*, 477 U.S. at 323. The movant can meet that burden by presenting evidence showing there is no genuine dispute of material fact, or by demonstrating that the nonmoving party has failed to present evidence in support of an element of its case on which it bears the ultimate burden of proof. *See Celotex*, 477 U.S. at 322-24. Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324. Moreover, to avoid summary judgment after the movant has met its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts.'" *Matsushita*, 475 U.S. at 586 (citations omitted).

## B. Review of the Record

Plaintiff has failed to make any arguments or submit any evidence in opposition to Defendants' motion. In the Eleventh Circuit, however, a court may not grant summary judgment solely by virtue of a party's default. *Jones v. Pandey*, 390 F. Supp 3d 1371, 1375 (M.D. Ga. 2005) (citing *Trs. of Cent. Pension Fund of Int'l Union of Operating Eng'g & Participating Emps. v. Wolfe Crane Servs. Inc.* 374 F.3d 1035, 1039 (11th Cir. 2004)). Instead, the Court must conduct an independent review of the Record to determine whether summary judgment is appropriate.

Plaintiff's failure to submit a response complicates the Court's required independent review. While Plaintiff's deposition testimony, the major portion of the Record which supports his claim, tells a harrowing tale, it is often not corroborated by, or is directly contradicted by, the extensive medical documentation Defendants provide. The Court must, therefore, discuss in detail the required standard for reviewing evidence at the summary judgment stage, before proceeding to the merits of Defendants' arguments.

On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict. *See Matsushita*, 475 U.S. at

587–88; *Allen*, 121 F.3d at 646. However, the Court must grant summary judgment if there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

Defendants assert that the Court "need not accept or give credit to the plaintiff's conclusory allegations that are not supported by physical evidence, medical records or corroborating witness testimony." (Doc. 38-2 at 14 (citing *Bennett v. Parker*, 898 F.2d 1530, 1532–33 (11th Cir. 1990)). Not so. Although the standard Defendants supply may have been, in the past, the law of the Eleventh Circuit, subsequent cases have disavowed any standard which requires corroboration of a plaintiff's testimony to survive summary judgment. *United States v. Stein*, 881 F.3d 853, 858 (11th Cir. 2018) (en banc) (citing *Strickland v. Norfolk Southern Ry. Co.*, 692 F.3d 1151, 1160 (11th Cir. 2018)); *Williams v. Radford*, 64 F.4th 1185, 1198 (11th Cir. 2023) ("to the extent that *Bennet* suggests (or can be read to hold) that an inmate's first-hand account of excessive force needs corroboration to survive summary judgment, it is no longer good law in this circuit").[3] A corroboration standard, essentially, requires the Court to assess credibility, which is solely the province of the jury. *See Stein*, 881 F.3d 853, 857–58 (11th Cir. 2018) (citing *Anderson*, 477 U.S. at 249). As such, the Court declines Defendants' invitation to impose a corroboration standard when considering their Motion for Summary Judgment. An allegation in Plaintiff's deposition alone, therefore, may create an issue of material fact and preclude summary judgment. *Williams*, 64 F.4th at 1198.

The requirement for a court to accept Plaintiff's firsthand account of events, however, is limited in two respects. First, the Court need not accept conclusory allegations. *See Stein*, 881 F.3d at 857 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (2018)). But a Court may rely on statements which contain descriptions of "specific, discrete facts of the who what, when, and where" variety. *See Sears v. Roberts*, 922 F.3d 1199, 1208 (11th Cir. 2019) (citing *Feliciano v. Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013)).

Second, although the Court must construe all evidence and reasonable inferences in favor of Plaintiff, the Court need not extend that standard to an interpretation of the facts that

---

[3] The Court notes that *Williams*, which expressly declared that *Bennett* was no longer good law for the proposition for which Defendants cite it, was decided before Defendants filed the instant motion for summary judgment. Defendants' brief, therefore, seriously misstates the Eleventh Circuit summary judgment standard in Defendants' favor.

is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Sears v. Roberts*, 922 F.3d 1199, 1208 (11th Cir. 2019) (citing *Scott v. Harris*, 550 U.S. 372 (2007)). As a result, "self-serving statements by a plaintiff do not create a question of fact in the face of contradictory, contemporaneously created medical records." *See e.g., Wooten v. MCranie*, No. 3:21-cv-416/MCR/ZCB, 2023 WL 2566031, at *4 (N.D. Fla. 2023) (citing *Whitehead v. Burnside*, 403 F. App'x 401, 403 (11th Cir. 2010)).[4] Accordingly, when there is a direct contradiction between Plaintiff's account and his medical records, the Court will adopt the facts set forth in the medical records, as facts about which there is no genuine dispute, particularly because Plaintiff does not contend that his medical records are fabricated.

## III.   LAW AND ANALYSIS

Defendants move for summary judgment on Plaintiff's Eighth Amendment Deliberate Indifference to Serious Medical Needs claim and for any supervisory liability claims alleged. (Doc. 38-2 at 1). The Court will first outline the facts of the case, consistent with the standard for parsing the evidence above, and then discuss the merits of Defendants' Qualified Immunity arguments.

---

[4]     The Court notes that whether a plaintiff's testimony can create a genuine dispute of fact in the face of contradictory, contemporaneously created medical records is not entirely settled in the Eleventh Circuit. As noted, the Eleventh Circuit has drifted away from a corroboration requirement at the summary judgment stage, calling into question much of the previous caselaw rejecting self-serving testimony by a plaintiff over contradictory documentation. *See Stein,* 881 F.3d at 858. The Court, however, is satisfied that contemporaneously created medical records still constitute the type of evidence which can render a Plaintiff's self-serving testimony, "blatantly contradicted by the record, so that no reasonable jury could believe it" for two reasons.

First, contemporaneous medical records are fundamentally different from other types of documentary evidence, such as the correctional officer reports regarding use of force rejected in *Williams*, because they provide facts and inferences beyond the personal knowledge of a lay-plaintiff. And second, the Court is persuaded by the example set by a number of district court cases rejecting a plaintiff's testimony in favor of contemporaneously created medical records. See *Wooten*, 2023 WL 2566031, at *4 (finding that a plaintiff's allegation of a hand injury, was refuted by the medical records of an examination of plaintiff at the time showing no hand injury); *Newman v. Moses*, No. 5:16-cv-2-WTH-GRJ, 2017 WL 4836508, at *8 (N.D. Fla. 2017) (finding that plaintiff's allegation that he was not provided with pain medications at an appointment was refuted by the medical record of the appointment, and therefore, no reasonable jury could believe that allegation); *Davis v. Peasant*, No. 2:19-cv-156-WHA-CSC, 2021 WL 6331852, at *10 (M.D. Ala. 2021) ("the law is settled that self-serving statements by a plaintiff do not create a question of fact in the face of contradictory, contemporaneously created medical records") (cleaned up); *Norwood v. Thomas*, No. 5:14-cv-00430-CLS, 2016 WL 192062, at *7 (N.D. Ala. 2016) ("there are many inconsistencies between plaintiff's allegations and his medical records, and this court will adopt the facts as set forth in the medical records where such inconsistencies exist")

A.   **Factual Summary**

Plaintiff is an inmate in the custody of the Georgia Department of Corrections who was confined at the Valdosta State Prison ("VSP") from January 28, 2019, to December 2, 2021. (Doc. 38-5 ¶ 4); (Doc. 38-3 at 13). In late 2019, Plaintiff became ill with flu-like symptoms which progressed into pneumonia and, ultimately, necrotizing pneumonia, an aggressive variety of pneumonia which destroys the surrounding lung tissue. (Doc. 38-4 at 15). As a result, Plaintiff was hospitalized for nine days. (Doc. 38-15 at 279). Plaintiff alleges that he suffered serious physical injury in the form of ongoing complications from this illness because Defendants refused to provide him with prescribed medications, medical attention, and prevented him from seeking medical treatment in the time leading up to his hospitalization. (Doc. 1 ¶ 28).

Plaintiff first reported symptoms on December 19, 2019, when he presented to Nurse Gregory,[5] a nurse at VSP, with a cough, runny nose, and headache which had been present for eight to fourteen days. (Doc. 38-10 at 44). Nurse Gregory examined Plaintiff and noted in a Nursing Assessment Report that he had a nonproductive cough with clear sputum,[6] clear lung sounds, and 100% oxygen saturation. (*Id.*) She assessed Plaintiff as having "possible flu," for which she gave him Tylenol and cough syrup. (*Id.*) Nurse Gregory scheduled Plaintiff for a follow up with an upper-level provider on December 12, 2019.[7] (*Id.*) When the prison medical director, Dr. Raymond Moody,[8] reviewed the record of Plaintiff's examination by Nurse Gregory, he opined that there was nothing in her examination which would indicate that Plaintiff had pneumonia. (Doc. 38-4 at 44).

---

[5] Nurse Gregory is not a Defendant in the above-captioned lawsuit.

[6] Plaintiff testifies that, throughout much of the period of his illness, he was coughing up "pieces of my lung where my lung was rotting on the inside." (*See e.g.,* Doc. 38-4 at 23). Although the medical documentation in the Record makes numerous references to Plaintiff having a cough which produced phlegm, the Record is bereft of any contemporaneous medical evidence which indicates that Plaintiff was, in fact, coughing up pieces of his lung. And Dr. Moody personally examined the substance Plaintiff believed to be pieces of his lung and concluded that Plaintiff was not coughing up any solid lung tissue. (Doc. 38-4 at 95–96). The Court, therefore, finds that there is no genuine dispute that Plaintiff was coughing up phlegm, rather than pieces of his lung.

[7] An upper-level provider is a physician or a nurse practitioner.

[8] Dr. Moody is not a Defendant in the above-captioned lawsuit. There is no expert medical evidence in the Record which contradicts Dr. Moody's opinions. Therefore, as to Dr. Moody's expert medical opinions, no genuine dispute of fact remains.

Plaintiff testifies that on or around December 24, 2019, after returning from a routine doctor's appointment, he was transported to the prison infirmary because he was coughing severely. (Doc. 38-3 at 25–26). When Plaintiff arrived, he was met by Defendant Unit Manager Delisha Bryant ("Defendant Bryant"), who refused to let him see medical personnel and, instead, instructed correctional officers to search Plaintiff and return him to the prison residential facilities. (Doc. 38-3 at 25–29).

The next day, Plaintiff's cough persisted, and prison personnel transported Plaintiff from his cell to the infirmary for evaluation. (Doc. 38-3 at 31–32). At the infirmary, Defendant Nurse Pamela Nisen ("Defendant Nisen") examined Plaintiff. (Doc. 38-3 at 31). Defendant Nisen noted in her report that Plaintiff had a productive cough with brown sputum, a fever, clear lung sounds, and had 100% oxygen saturation. (Doc. 38-10 at 45). Defendant Nisen instructed Plaintiff to take Tylenol for his fever and to follow up with an upper-level provider at an appointment the next day. (*Id.*) Dr. Moody opined that given the combination of Plaintiff's productive cough with brown sputum and his elevated temperature, it was appropriate that he be seen by an upper-level provider the next day. (Doc. 38-4 at 22).

Plaintiff did not see an upper-level provider the next day, December 26, 2019, although it is unclear from the Record why. (Doc. 38-3 at 33); (Doc. 38-4 at 24).[9] However, because Plaintiff's symptoms persisted, he was transported to the prison infirmary for examination. (Doc. 38-3 at 33). Plaintiff testified that he was examined by Defendant Nurse Tina Starling ("Defendant Starling") who refused to treat him beyond giving him cough syrup. (Doc. 38-3 at 33–45). What is also clear from the Record, is that one Nurse Marshall[10] examined Plaintiff that day.[11] (Doc. 38-10 at 46). Plaintiff presented to Nurse Marshall with a cough and shortness

---

[9] Dr. Moody testified that inmates sometimes miss appointments "if there's trouble in the prison or if they had difficulty bringing someone up." (Doc. 38-4 at 24).

[10] Nurse Marshall is a nurse at VSP who is not a Defendant in the above-captioned lawsuit.

[11]     In his deposition, Plaintiff describes, in depth, an examination performed by a nurse on December 26, 2019, who he identifies as Defendant Starling. (Doc. 38-3 at 32–34). Plaintiff does not describe any other examination that day. (*See Id.*) But Defendant Starling denies examining Plaintiff on December 26, 2019. (Doc. 38-7 at 3 ¶ 7). And if Defendant Starling did see Plaintiff, the Record does not contain any notes from the visit. The only documented examination in Plaintiff's medical record on December 26, 2019, is by Nurse Marshall who conducted and recorded an in-depth examination of Plaintiff which is highly similar to the one Plaintiff testifies that Nurse Starling performed. (Doc. 38-10 at 46). In his deposition, Plaintiff testified that, if there is no documentation in his record that reflects a visit with Nurse Starling, then she "did not do her job." (Doc. 38-3 at 34).

of breath. (Doc. 38-10 at 46). Nurse Marshall noted in her report that Plaintiff had a productive cough with moderate, light green sputum, wheezing lung sounds, and he had 100% oxygen saturation. (*Id.*) Nurse Marshall assessed that Plaintiff had a possible upper respiratory infection, and/or possible flu. (*Id.*) She gave him cough syrup and directed that he be seen by an upper-level provider the next day. (*Id.*) Dr. Moody opined that from Plaintiff's examination on December 26, 2019, his symptoms had improved, and Nurse Marshall's treatment and assessment of Plaintiff was appropriate based on her examination. (Doc. 38-4 at 26).

Plaintiff first saw an upper-level provider, Nurse Practitioner Woodburn,[12] on December 27, 2019. (Doc. 38-3 at 47). In her examination, Nurse Practitioner Woodburn noted that Plaintiff had a cough, no shortness of breath, a fever, and his oxygen saturation had dropped to 95%. (Doc. 38-10 at 47). Nurse Practitioner Woodburn also noted decreased sounds and crackles in Plaintiff's right lower lung field which can indicate fluid or inflammation in the lungs. (*Id.*); (Doc. 38-4 at 29). From this examination, Nurse Practitioner Woodburn suspected that Plaintiff had pneumonia; and, as a result, gave Plaintiff antibiotics and arranged for him to be transported to the emergency department at South Georgia Medical Center. (Doc. 38-10 at 47). Dr. Moody opined that based on Nurse Practitioner Woodburn's assessment of possible pneumonia and her examination it was appropriate to send Plaintiff to the emergency room for evaluation. (Doc. 38-4 at 30).

Plaintiff arrived at South Georgia Medical Center at approximately noon on December 27, 2019. (Doc. 38-16 at 359). Plaintiff was examined by Dr. Richard Westenbarger, who diagnosed him with community acquired pneumonia of the left lower lobe of his lung. (Doc. 38-16 at 389). Plaintiff spent approximately six hours in the emergency department,

---

A jury might well conclude that Plaintiff mistakenly identified Defendant Starling as the nurse who examined him on December 26, 2019, when, in fact, he was examined by Nurse Marshall. The Court, however, may not invade the province of the jury as such to determine that Plaintiff was mistaken about who examined him, at least for the purposes of the instant motion. Accordingly, the Court makes two findings about the events of December 26, 2019. First, a genuine dispute of fact exists as to whether Plaintiff was examined by Defendant Starling, and therefore, viewing the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff was examined by Defendant Starling on December 26, 2019. And second, based on the medical records created by Nurse Marshall, there is no genuine dispute of fact that Plaintiff was also examined by Nurse Marshall on December 26, 2019. Taken together, therefore, the Court concludes that, at least for the purposes of the instant motion, Defendant was examined by both Nurse Starling, who did not record the interaction, and Nurse Marshall, who did.

[12] Nurse Woodburn is a Nurse Practitioner at VSP who is not a defendant in the above-captioned lawsuit.

during which he was given intravenous saline and antibiotics.[13] (Doc. 38-16 at 359–368). Dr. Westenbarger recorded in his notes that "patient is actively coughing and appears to suffer from malaise but he does not appear especially ill." (Doc. 38-16 at 355). Plaintiff was discharged to "continue treatment in the infirmary." (Doc. 38-16 at 356). Upon discharge, Dr. Westenbarger prescribed Plaintiff Zithromax, to be taken for seven days and Augmentin, to be taken for four days. (Doc. 38-16 at 356).[14]   VSP medical staff administered Plaintiff's medications as prescribed by Dr. Westenbarger. (Doc. 38-10 at 49–53).[15]

When Plaintiff returned to VSP, he spent the next two weeks in the infirmary. (Doc. 38-3 at 40–54). With regards to this period, Plaintiff makes non-specific allegations that Defendants Nisen and Starling denied him medical care which resulted in his hospitalization for a second time. (*See Id.*).[16] The Record reveals, however, that while Plaintiff's condition, initially improved when he was discharged from the emergency department, over the next two weeks his condition deteriorated despite monitoring and treatment at the prison infirmary.

On December 30, 2019, Dr. Moody conducted a post-hospitalization follow-up examination of Plaintiff. (Doc. 38-10 at 47). Plaintiff had a cough which was less productive, and he had crackles in the lower field of his left lung. (*Id.*); (Doc. 38-4 at 31). Dr. Moody, therefore, concurred with Dr. Westenbarger's pneumonia diagnosis, and ordered that Plaintiff continue antibiotics. (Doc. 38-10 at 47); (Doc. 38-4 at 31). Later that day Dr. Moody heard

---

[13] Plaintiff testified that he spent sixteen hours in the emergency department. (Doc. 38-3 at 39). The emergency department medical notes, however, indicate that Plaintiff arrived at 12:45 P.M. on December 27, 2019, and was discharged at 6:26 P.M that same day. (Doc. 38-16 at 358–368). Therefore, as to the time Plaintiff spent in the emergency department, no genuine dispute of fact remains.

[14] Plaintiff testified that Dr. Westenbarger prescribed Plaintiff "IV antibiotics, the shots, and three pills" when Plaintiff was discharged (Doc. 38-3 at 41). Dr. Westenbarger's notes, however, indicate that he prescribed Plaintiff Augmentin 125mg tablet to be taken twice per day for seven days, and Zithromax 250mg tablet to be taken once per day for four days. Because Plaintiff's account is directly contradicted by Dr. Westenbarger's contemporaneously created medical notes, prescribing plaintiff seven days of Zithromax and four days of Augmentin, no genuine dispute remains as to this fact.

[15] Plaintiff testified that Defendants failed to administer his medications as prescribed by Dr. Westenbarger. The VSP Medication Administration Record ("MAR"), however, reveals that Plaintiff received an Augmentin 125mg tablet twice per day for seven days, and Zithromax 250mg tablet once per day for four days—the medication regimen prescribed by Dr. Westenbarger at discharge. (Doc. 38-4 at 144–148). Because Plaintiff's account is directly contradicted by the contemporaneously created MAR, no genuine dispute remains as to whether Plaintiff was given his medications as prescribed by Dr. Westenbarger.

[16] For example, Plaintiff testified that during the two-week period Defendants Nisen and Starling would refuse to check his vitals, but he did not know how many times he saw those nurses during the period. (Doc. 38-3 at 44–45, 52). And he also testified that for "the whole two-week period until they sent me back" Nurse Nisen and Starling "kept saying I was breathing fine. There wasn't nothing wrong with me." (Doc. 38-4 at 53).

Plaintiff "coughing vigorously" and went to check on him. (Doc. 38-10 at 48). As a result, Dr. Moody, prescribed Plaintiff codeine cough syrup and Ipratropium, a "lung expanding" medication. (Doc. 38-4 at 46–47). A few days later, on Thursday, January 2, 2020, Plaintiff was examined by a Nurse[17] who noted that his vitals were stable with an oxygen saturation of 97% and assessed that he should continue to be monitored in the infirmary, (Doc. 38-11 at 30), which Dr. Moody opined was an appropriate course of action. (Doc 38-4 at 49–50).

On Monday, January 6, 2020, Nurse Practitioner Debra Seleska[18] examined Plaintiff, who had been observed with an excessive cough and vomiting. (Doc. 38-11 at 30). Nurse Practitioner Seleska noted that Plaintiff had diminished lower left lobe lung sounds but his oxygen saturation was 97%. (*Id.*) As a result, Nurse Practitioner Seleska concluded that Plaintiff's pneumonia persisted and restarted him on Augmentin (*id.*), which Dr. Moody opined was an appropriate course of action. (Doc. 38-4 at 52).

On Thursday, January 9th, 2020, Plaintiff informed Defendant Nisen that he was unable to breathe. (Doc. 38-11 at 31). Upon examination, however, Plaintiff's respiration was even and unlabored, and his oxygen saturation was 99%. (*Id.*) As a result, Defendant Nisen assessed that Plaintiff should continue to be monitored. (*Id.*) Nurse Practitioner Seleska saw Plaintiff and concurred with Defendant Nisen's assessment. (*Id.*); (Doc. 38-6 ¶ 14). Dr. Moody opined that continuing to monitor Plaintiff was an appropriate course of action, and that there was nothing that would indicate to Defendant Nisen that Plaintiff's pneumonia had progressed to necrotizing pneumonia. (Doc. 38-4 at 59). The next day, Plaintiff presented to Dr. Moody with difficulty breathing and an oxygen saturation of 83%, meaning he was hypoxic. (Doc. 38-11 at 31–32); (Doc. 38-4 at 60). Dr. Moody, therefore, arranged for Plaintiff to be transported by ambulance to the emergency department once again. (Doc. 38-11 at 31–32).

Plaintiff was admitted to South Georgia Medical Center where he was treated for nine days. (Doc. 38-15 at 279). A chest X-ray revealed that Plaintiff's pneumonia had progressed

---

[17] The Court is unable to identify from the Record the specific identity of the nurse who examined Plaintiff on January 2, 2020, because the signature in his/her chart note is illegible. (*See* Doc. 38-4 at 151). Dr. Moody, like the Court, was also unable to decipher the signature. (Doc. 38-4 at 48). The Record is clear, however, that Plaintiff was not examined by either Defendant Nisen or Starling. (*See* Doc. 38-4 at 48); (Doc. 38-6 ¶ 9-15); (Doc. 38-7 ¶ 7).
[18] Nurse Practitioner Debra Seleska is a Nurse Practitioner at VSP who is not a defendant in the above-captioned lawsuit.

to necrotizing pneumonia in the lower lobe of his left lung, and as a result, he had become severely septic. (Doc. 38-15 at 355). Plaintiff was treated with intravenous antibiotics after which his sepsis resolved, and he was no longer hypoxic. (*Id.*) Plaintiff was given oral antibiotics and instructed to follow up with his primary care physician in one week. (*Id.*) Plaintiff was transported back to VSP on January 19, 2020. (Doc. 38-11 at 33). While back at VSP, Plaintiff received the antibiotics as prescribed at South Georgia Medical Center, and follow-up care. (Doc. 38-11 at 32–37). Plaintiff does not contend that Defendants denied him medical care after his return from South Georgia Medical Center on January 19, 2020. (Doc. 38-3 at 62). A chest x-ray taken in March 2020 showed that Plaintiff's pneumonia had cleared. (Doc. 38-4 at 69–70, 167).

In July 2020, Plaintiff's pneumonia reappeared and he was sent to the emergency room for evaluation. (Doc. 38-12 at 27). Plaintiff was admitted to South Georgia Medical Center for three days where he was treated with intravenous antibiotics, and he discharged in stable condition. (Doc. 38-15 at 93–94). Plaintiff received a number of follow-up chest x-rays which revealed that he had some scarring of the lower lobe of his left lung as a result of his pneumonia. (*See e.g.,* Doc. 38-4 at 82, 165). Dr. Moody opined, however, that there was nothing in Plaintiff's treatment records which indicate that he suffers ongoing effects from his pneumonia condition. (Doc. 38-4 at 82–83).[19] Moreover, Dr. Ayeodele Ayedun, the Medical Director at Johnson State Prison, where Plaintiff has resided since September 8, 2022 related that "since his arrival at [Johnson State Prison], [Plaintiff] has not sought or required treatment for any effects, complications, symptoms, or sequalae that in my judgment were or are related to or result from [his previous episode of pneumonia and necrotizing pneumonia]." (Doc. 38-8 ¶ 5).

---

[19] Plaintiff testified that his necrotizing pneumonia caused his "left lung to rot from the inside out," and "shrink up to the size of a walnut and turn into a piece of leather" and as a result he no longer has any function in his left lung. (Doc. 38-3 at 72–73). However, Plaintiff's numerous chest x-rays, although they reveal scarring of the lower lobe of his left lung, provide no support for Plaintiff's assessment that he has lost all function in his left lung. (*See* Doc. 38-12 at 16, 26, 32–33); (Doc. 38-13 at 13–14, 48–49); (Doc. 38-15 at 117). Because Plaintiff's assessment of his medical condition is directly contradicted by the contemporaneously created medical documentation interpreting his chest x-rays, the Court finds that no genuine dispute of material fact remains as to the condition of Plaintiff's lungs as revealed in those chest X-rays.

### B. Qualified Immunity

Defendants assert that they are entitled to the protection of Qualified Immunity for Plaintiff's claims. (*See* Doc. 38-2 at 13–23). "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The doctrine "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

In the Eleventh Circuit:

> To be eligible for qualified immunity, the official must first establish that he was performing a discretionary function at the time the alleged violation of federal law occurred. Once the official has established that he was engaged in a discretionary function, the plaintiff bears the burden of demonstrating that the official is not entitled to qualified immunity. In order to demonstrate that the official is not entitled to qualified immunity, the plaintiff must show two things: (1) that the defendant has committed a constitutional violation and (2) that the constitutional right the defendant violated was clearly established at the time he did it.

*Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004) (internal quotation marks omitted) (citations omitted). Thus, in the Eleventh Circuit, the Court first determines whether Defendants were engaged in a discretionary function before moving on to determine whether Plaintiff has presented relevant facts that Defendant committed a constitutional violation, and that violation was clearly established at the time of the Defendants' conduct. "To determine whether an official was engaged in a discretionary function, we consider whether the acts the official undertook are of a type that fell within the employee's job responsibilities." *Id* at 1332 (internal quotations marks omitted) (citation omitted).

In this case, Defendants are employees of VSP who were performing their job duties at the prison. (*See* Doc. 38-5 ¶ 3); (Doc. 38-6 ¶ 2); (Doc. 38-7 ¶ 2). Defendant Bryant is the medical unit manager at VSP, and in this role, she is responsible for coordinating the logistics of medical care for inmates, such as organizing appointments and ensuring that inmates attend appointments. (Doc. 38-4 at 15–16). She has no role in providing medical care or treatment to inmates. (Doc. 38-5 ¶ 3). Defendant Bryant is being sued for failing to perform her role by

preventing Plaintiff from receiving medical care. (Doc. 1 ¶ 27). Accordingly, the Court finds that Defendant Bryant was engaged in a discretionary function.

Similarly, Defendants Nisen and Starling are nurses at VSP who are responsible for examining patients in the infirmary, administering medication, assessing medical emergencies, and referring patients to upper-level providers. (Doc. 38-6 ¶ 2); (Doc. 38-7 ¶ 2). Defendants Nisen and Starling are being sued for failing to perform their role by failing to examine and treat Plaintiff. (Doc. 1 ¶ 28). Accordingly, the Court finds that Defendants Nisen and Starling were engaged in a discretionary function. The Court, therefore, turns to whether there are relevant facts in the Record that Defendants committed a constitutional violation, if any, and whether that violation was clearly established at the time of the violation.

### 1. Deliberate Indifference to Serious Medical Needs

Defendants move for summary judgment on Plaintiff's Eighth Amendment deliberate indifference to serious medical needs claim. (Doc. 38). The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishment." U.S. Const. amend VIII. The Eighth Amendment, however, extends beyond proscribing "physically barbarous" punishments. *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). In *Estelle*, the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment." *Id.* at 104–105. To establish that Defendants were deliberately indifferent to his serious medical needs, Plaintiff must show: (1) he had a serious medical need, an objective test; (2) Defendants were deliberately indifferent to the risk posed by that need, a subjective test; and (3) causation between that indifference and his injury. *Goebert v. Lee Cty.*, 510 F.3d 1312, 1326 (11th Cir. 2007) (citing *Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1115 (11th Cir. 2005)). Plaintiff alleges that Defendants' conduct amounted to deliberate indifference to his serious medical needs. (Doc. 1 ¶ 27–29).

### a. Serious Medical Need

Plaintiff must show that he had a serious medical need. *Goebert*, 510 F.3d at 1326. Here, Plaintiff had a serious illness which, as Dr. Moody opined, required treatment and which had serious, life-threatening complications. (*See* Doc. 38-4). Defendants do not contend that

Plaintiff did not, objectively, have a serious medical need. Accordingly, the Court finds, as a matter of law, that Plaintiff had a serious medical need.

### b.    Deliberate Indifference

Second, Plaintiff must show that Defendants were deliberately indifferent to his serious medical need. To show that a prison official was deliberately indifferent, a plaintiff must show that a defendant (1) had a subjective knowledge of a risk of serious harm; (2) disregarded that risk; (3) by conduct that is more than gross negligence. *Townsend v. Jefferson Cty.*, 601 F.3d 1152, 1158 (11th Cir. 2010) (cleaned up) (citing *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005)).[20] The Court will address Defendant Bryant's conduct first, and then Defendants Nisen and Starling's conduct.

### i.    Defendant Bryant

Plaintiff alleges that Defendant Bryant, on December 24, 2019, prevented Plaintiff from seeing medical staff in the infirmary when he came to the infirmary coughing severely. (Doc. 1 ¶ 10, 27); (Doc. 38-3 at 66–67).[21] On that day, Plaintiff was returning from an external appointment at the clinic which provides him treatment relating to his prosthetic leg.[22] When Plaintiff returned, an unidentified nurse sent him to the infirmary because he had a cough

---

[20]     The Court notes that the standard for deliberate indifference is somewhat unclear in the wake of *Wade v. McDade*. 67 F.4th 1363 (11th Cir. May 22, 2023), *vacated by Wade v. Ga. Corr. Health, LLC*, 83 F.4th 1332 (11th Cir. October 11, 2023). In *Wade v. McDade*, an Eleventh Circuit panel explained "for more than 25 years now, our case law regarding a deliberate indifference claim's mens rea element has been hopelessly confused, resulting in what we'll charitably call a 'mess'." *Wade*, 67 F.4th at 1371. Interpreting *Farmer v. Brennan*, 511 U.S. 825 (1994), which explained the term "deliberate indifference," Eleventh Circuit decisions have used two competing formulations of the standard of care in deliberate indifference cases: either "more than mere negligence" or "more than gross negligence." *Compare Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995) *with Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996).

The *Wade v. McDade* panel attempted to put an end to the confusion and concluded the "more than gross negligence" formulation was the correct one. The Eleventh Circuit, however, granted a rehearing *en banc* and vacated the *Wade* panel's opinion on October 11, 2023. As a result, the Eleventh Circuit authority has briefly returned to its somewhat muddled state. *Wade v. Ga. Corr. Health, LLC*, 83 F.4th at 1332. The Court, nonetheless, is persuaded by the reasoning in *Wade v. McDade* and therefore employs the "more than gross negligence" formulation. However, for the purposes of this Order, as the Court will discuss below, the result would be the same under both formulations of the standard of care in deliberate indifference cases used by the Eleventh Circuit.

[21] Plaintiff also alleges various acts of "harassment" against Defendant Bryant such as forcing him to clean his room when he was severely ill. (Doc. 1 ¶ 19). However, because there is no evidence in the Record which suggests that this harassment negatively impacted Plaintiff's medical condition, the Court finds that it is not relevant to the analysis of whether Defendant Bryant was deliberately indifferent.

[22] Plaintiff has a left below-knee amputation for which he uses a prosthetic leg which is unrelated to the pneumonia condition which is the subject of the above-captioned lawsuit.

which produced phlegm. (Doc. 38-4 at 23–24). Defendant Bryant met Plaintiff when he arrived at the infirmary, and he informed her that he was "coughing up my lungs." (Doc. 38-3 at 24). Despite this, Defendant Bryant refused to allow Plaintiff to see a medical provider because he did not have an appointment. (Doc. 38-3 at 26–27). Instead, Defendant Bryant had Plaintiff searched and ordered him to leave the infirmary and "go back to [his] building." (*Id.*) The next day, however, Plaintiff was examined by Nurse Nisen. (Doc. 38-10 at 44).

Even when medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs. *Farrow v. West*, 320 F.3d 1235, 1246 (11th Cir. 2003) (citing *McElligot v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)). Defendants argue that Defendant Bryant was not deliberately indifferent. (Doc. 38-2 at 20).[23] The Court agrees for two reasons.

First, the Record does not reflect that Defendant Bryant was subjectively aware of Plaintiff's serious medical need. When a prison official lacks medical training, for a Court to find that the official has a subjective knowledge of a plaintiff's serious medical need, that need must be "so obvious that a lay person would easily recognize the necessity for a doctor's attention." *See Goebert v. Lee Cty.*, 510 F.3d 1312, 1326 (11th Cir. 2007) (citing *Hill v. Deklab Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 2009)[24]). Although Plaintiff's condition eventually became serious, he was only coughing up phlegm when he came to the infirmary on December 24, 2019. The next day, when Plaintiff presented to Nurse Gregory, who unlike Defendant Bryant had medical training, with the same symptoms, Nurse Gregory saw no need

---

[23] Defendants argue that because Defendant Bryant is not, herself, a medical provider, and did not prevent Plaintiff from attending any scheduled medical appointments, she cannot have been deliberately indifferent. The Court agrees with Defendants to the extent that if Defendant Bryant did not prevent Plaintiff from attending scheduled medical appointments it would be evidence that she was not deliberately indifferent. The Court's inquiry, however, cannot end there. It is well established in the Eleventh Circuit that when correctional officers are subjectively aware of a serious medical need, they may have a duty to either render aid to an inmate or allow that inmate access to medical services. *See e.g., Brown v. Hughs*, 894 F.2d 1533, 1538–39 (11th Cir. 1990) (holding that a reasonable jury could find that a correctional officer who was subjectively aware that an inmate had a broken leg but failed to summon medical aid was deliberately indifferent—even when that inmate had no scheduled medical appointment). Accordingly, Defendants cannot be entitled to summary judgment based solely on the fact that Defendant Bryant did not prevent Plaintiff from going to a scheduled medical appointment.

[24] *Hill v. Dekalb Cty.* was overruled in *Hope v. Pelzer* to the extent that it dealt with clearly established rights for the purposes of a qualified immunity analysis. However, it remains good law with respect to its application to a deliberate indifference analysis. *See Owen*, 703 F. App'x at 847.

for urgent treatment, and scheduled Plaintiff to be seen by an upper-level provider in a week. (Doc. 38-10 at 44). And Dr. Moody opined that there was nothing in Plaintiff's symptoms when he presented to Nurse Gregory which would indicate the need for urgent medical care or that Plaintiff had pneumonia. (*See* Doc. 38-4 at 20). The Record, therefore, reflects that even a physician might not have recognized Plaintiff as needing urgent medical care and, for that reason, Plaintiff's need cannot have been obvious to Defendant Bryant. Accordingly, the Court finds that Defendant Bryant was not subjectively aware of Plaintiff's serious medical need, and, consequently, she was not deliberately indifferent as a matter of law.

Even assuming for the sake of argument that Defendant Bryant was subjectively aware of Plaintiff's severe medical need, to show deliberate indifference by delaying treatment, an inmate must "place verifying medical evidence in the record to establish the detrimental effect of a delay in treatment." *Owen v. Corizon Health Inc.*, 703 Fed. App'x 844, 847 (11th Cir. 2017) (citing *Hill*, 40 F.3d at 1188)); *Cannon v. Corizon Med. Servs.*, 795 F. App'x 692, 698 (11th Cir. 2019). Plaintiff has not done so. Defendant Bryant's conduct delayed Plaintiff from seeing a prison medical provider by only one day, and when Plaintiff saw Nurse Gregory that next day she scheduled him to see an upper-level provider one week later. (Doc. 38-7 at 7) There is no evidence in the Record that Defendant Bryant delaying Plaintiff from seeing a Nurse by one day made any difference to when he would see an upper-level provider, nor that the delay had any impact on the ultimate severity of his illness. Accordingly, the Court finds that because Plaintiff has placed no medical evidence in the Record which establishes the detrimental effect of the delay in his treatment caused by Defendant Bryant, she was not deliberately indifferent as a matter of law.

In sum, because the Court finds that, as a matter of law, Defendant Bryant was not deliberately indifferent, no underlying constitutional violation occurred when she delayed Plaintiff's medical care and, therefore, Defendant Bryant is entitled to Qualified Immunity.[25] Accordingly, Defendants' Motion for Summary Judgment is **GRANTED** with respect to Plaintiff's Deliberate Indifference to Serious Medical Needs claim against Defendant Bryant.

---

[25] Because the Court has found no underlying constitutional violation, the Court need not evaluate the merits of Defendants' arguments that they did not violate clearly established law.

ii.   **Defendants Nisen and Starling**

The Court construes Plaintiff's Complaint and testimony as making out two claims against Defendants Nisen and Starling: (1) that they delayed treatment for his pneumonia condition before his evaluation at the emergency room on December 27, 2019 and (2) that they failed to give him medication as prescribed or provide treatment, in the two week period after he was discharged from the emergency room, and before his nine-day stay at South Georgia Medical Center which began on January 9, 2020. (Doc. 1 ¶ 28); (Doc. 38-3 at 67–70). Defendants argue, generally, that because neither Defendant "refused or denied any care to Plaintiff during the December 21, 2019, to January 19, 2020" time period, they are entitled to summary judgment.[26] The Court will address each of Plaintiff's allegations against Defendants Nisen and Starling in turn.

a.   *Delay of Treatment: Defendant Nisen*

Plaintiff alleges that on December 25, 2019, Nurse Nisen, by examining him and sending him back to his living quarters without providing treatment instead of referring him to an upper-level provider immediately, she unconstitutionally delayed his medical treatment. (Doc. 1 ¶ 28); (Doc. 38-3 at 48). As noted, even when medical care is ultimately provided, a prison official may act with deliberate indifference by delaying the treatment of serious medical needs. *Farrow*, 320 F.3d at 1246.

When Defendant Nisen examined Plaintiff on December 25, 2019, she noted that Plaintiff had a productive cough with brown sputum, a fever, clear lung sounds, and 100% oxygen saturation. (Doc. 38-10 at 45). Defendant Nisen treated Plaintiff's fever with Tylenol and confirmed his appointment with an upper-level provider for the next day——an appointment which Nurse Gregory had already scheduled the previous week. (*Id.* at 44); (Doc. 38-6 ¶ 8); (Doc. 38-10 at 44). Dr. Moody opined that this was an "appropriate assessment and

---

[26] Defendants spend much of their brief characterizing Plaintiff's allegations as a "disagreement with the course of treatment he was provided" and explaining how that alone does not make out a claim for deliberate indifference. Defendants, however, misconstrue Plaintiff's allegations. Plaintiff takes no issue with the course of treatment Dr. Moody, Nurse Practitioner Seleska, or Nurse Practitioner Woodburn ordered. Instead, Plaintiff alleges that Defendant Nisen and Starling delayed his examinations and treatment by upper-level providers and refused to follow the treatment plan ordered by those providers. Accordingly, the Court finds Defendants' specific arguments about how a disagreement with course of treatment does not constitute deliberate indifference, unpersuasive, and will therefore construe Defendants' argument as generally arguing that Defendants Nisen or Starling did not refuse or deny him care.

treatment" given Plaintiff's symptoms and Nurse Nisen's recorded examination. (Doc. 38-4 at 22). Although Plaintiff was not, in fact, seen by an upper-level provider until December 27, 2019, the Court can find no evidence in the Record that Defendant Nisen was responsible for this delay. (*See* Doc. 38-4 at 24). Plaintiff was, instead, seen by Nurse Marshall, but by then his symptoms had improved. (Doc. 38-4 at 26). When Nurse Practitioner Woodburn examined Plaintiff on December 27, 2019, however, his symptoms had deteriorated and he had decreased lung sounds with crackles; and his oxygen saturation had dropped to an abnormal 95%. (Doc. 38-10 at 47); (Doc. 38-4 at 30). As a result of this deterioration, Nurse Practitioner Woodburn sent Plaintiff to the emergency room for evaluation. (Doc. 38-10 at 47); (Doc. 38-4 at 30).

The Court finds that Defendant Nisen was not deliberately indifferent for two reasons. First, Plaintiff has again failed to place verifying medical evidence in the Record to establish the detrimental effect of the delay in treatment, if any, from Defendant Nisen's actions. *See Owen*, 703 Fed. App'x at 847 (11th Cir. 2017). Instead of immediately referring Plaintiff to an upper-level provider, as Plaintiff contends Defendant Nisen should have, she confirmed his appointment with an upper-level provider for the next day and, as noted, the Court can find no evidence in the Record to suggest that Defendant Nisen was responsible for the subsequent delay in seeing that provider until December 27, 2019. Consequently, the amount of time that Nurse Nisen delayed Plaintiff's treatment was, at most, a single day. Plaintiff has failed to place medical evidence in the Record that such a short delay had any detrimental effect on the course of his illness. Instead, the Record reflects that in the 24-hour period after Defendant Nisen examined Plaintiff, his vital signs improved, as documented in Nurse Gregory's examination—strong evidence that emergency intervention by an upper-level provider was unnecessary at the time of Defendant Nisen's examination. (Doc. 38-4 at 26). As such, the Court finds that, as a matter of law, Plaintiff cannot meet his burden to show that Defendant Nisen was deliberately indifferent.

Second, there is no evidence in the Record to suggest that Defendant Nisen was even negligent, let alone the higher standard required for deliberate indifference, in delaying

Plaintiff's medical care.[27] Dr. Moody reviewed Defendant Nisen's Nursing Assessment Report, and he opined that, based on Plaintiff's presentation, Defendant Nisen's assessment and treatment were appropriate. (Doc. 38-4 at 22). The Court can find no expert medical evidence in the Record which contradicts Dr. Moody's assessment of Defendant Nisen's actions, and, therefore, accepts his opinion regarding those actions as a fact as to which there is no genuine dispute. Accordingly, the Court finds that because Plaintiff has placed no medical evidence in the Record which establishes the detrimental effect of the delay in his treatment caused by Defendant Nisen on December 25, 2019, she was not deliberately indifferent that day as a matter of law.

> b.    *Delay of Treatment: Defendant Starling*

Plaintiff alleges that Defendant Starling, on December 26, 2019, by sending him back to his living quarters without providing treatment, unconstitutionally delayed his medical treatment. (Doc. 1 ¶ 28); (Doc. 38-3 at 49–50). Plaintiff has, once again, failed to place verifying medical evidence in the Record to establish that any delay in treatment on December 26, 2019, was detrimental.

As discussed previously, the Record, taken in the light most favorable to Plaintiff, reflects that on December 26, 2019, Plaintiff was examined by Defendant Starling, who did not record the examination, and Nurse Marshall, who did. *See supra* note 11 and accompanying text. Plaintiff testified that Defendant Starling "checked [his] pulse, listened to him with a stethoscope, and said he was breathing fine." (Doc. 38-3 at 32). It is unclear from Plaintiff's testimony when, exactly, Defendant Starling examined Plaintiff, but Nurse Gregory examined him at 9:25 P.M. on December 26, 2019. (Doc. 38-10 at 46). Nurse Gregory reported that Plaintiff's symptoms had improved since Defendant Nisen examined him the day before. Nurse Marshall nonetheless instructed Plaintiff to follow up with an upper-level provider in the morning, which Plaintiff did at 10:50 A.M. the next day. (*Id.*); (*see* Doc. 38-3 at 35). Reviewing Nurse Marshall's notes, Dr. Moody, about whose opinion no genuine dispute of fact remains, opined that, based on Plaintiff's symptoms on December 26, 2019, it was

---

[27] The Court notes that, specifically, Nurse Nisen's conduct does not rise to either formulation used by the Eleventh Circuit to describe the standard of care for a deliberate indifference claim. Thus, Nurse Nisen's conduct was neither "more than mere negligence" nor "more than gross negligence."

unnecessary to send Plaintiff to the emergency room based on his symptoms, but it would be appropriate for him to see an upper-level provider the next day. (Doc. 38-4 at 27). Therefore, even to the extent that Defendant Starling delayed Plaintiff's treatment on December 26, 2019, because emergency treatment was unnecessary in the evening, Plaintiff cannot have suffered any detriment as a result of Defendant Starling's refusal to provide emergency treatment earlier that day. Accordingly, the Court finds that because Plaintiff has placed no medical evidence in the Record which establishes the detrimental effect of the delay in his treatment caused by Defendant Starling on December 26, 2019, she was not deliberately indifferent that day as a matter of law.

      *c.*     *Defendants Nisen and Starling's Refusal to Provide Medication or Treatment*

Plaintiff alleges that Defendants Nisen and Starling failed to give him medication and treatment as ordered by upper-level providers in the two-week period, between December 28, 2019 and January 9, 2020, at the end of which he was admitted to South Georgia Medical Center. (Doc. 1 ¶ 28); Doc. 38-4 at 50–53). Defendants argue that the Record does not support this allegation. (Doc. 38-2 at 18). The Court agrees.

During the two-week period in question, Plaintiff was housed in the VSP infirmary. (Doc. 38-3 at 40–54). During this period, he testified that he would encounter "anywhere from six to eight, ten nurses," each day. (Doc. 38-3 at 52–53). Plaintiff's medications were administered as Dr. Westenbarger prescribed at the South Georgia Medical Center emergency department,[28] and after that, they were administered to reflect the changes made by the upper-level providers at VSP. (Doc. 38-10 at 49–50); (Doc. 38-4 at 39–42).[29] Despite Plaintiff's contention that he was refused treatment during this period, he was seen at least five times by an upper-level provider who recorded their examination and made adjustments to Plaintiff's treatment to reflect the progression of Plaintiff's condition.[30] Plaintiff's references to isolated occasions where Defendant Nisen or Starling would refuse to examine him, or say he was "breathing fine," therefore, appear to be selectively identified examples of lack of treatment at

---

[28] *See supra* notes 14–15 providing detailed discussion.

[29] Defendants Nisen and Starling were responsible for giving Plaintiff medication for only a small fraction of the times Plaintiff was administered medications, and the MAR reflects that they gave those medications as prescribed. (Doc. 48-10, at 49–50); (Doc. 38-6 ¶¶ 11-14).

[30] Critically, Plaintiff does not take issue with the treatment of the upper-level providers.

specific moments, when the Record as a whole reflects that Plaintiff was seen frequently by nurses and upper-level providers; and his treatment was consistent with the orders of upper-level providers. Accordingly, because Plaintiff's allegations that Defendants Nisen and Starling failed to give him medication and treatment as ordered between December 28, 2019 and January 9, 2020, are unsupported by the Record, even when taken in the light most favorable to Plaintiff, the Court finds, as a matter of law, that Defendants Nisen and Starling were not deliberately indifferent during that period.

In sum, because the Court finds, as a matter of law, that Defendants Nisen and Starling were not deliberately indifferent at any time alleged, no constitutional violation occurred, and therefore, Defendants Nisen and Starling are entitled to Qualified Immunity with respect to Plaintiff's deliberate indifference claim against them.[31] Accordingly, Defendants' Motion for Summary Judgment is **GRANTED** with respect to Plaintiff's deliberate indifference to serious medical needs claim against Defendants Nisen and Starling.

### 2. Supervisory Liability

Defendants move for summary judgment on Plaintiff's claims of supervisory liability, if any, that Plaintiff alleges. (Doc. 38-2 at 20–22).[32] Defendants argue that Plaintiff cannot show that any Defendant, in their capacity as a supervisor, caused a constitutional violation. The Court agrees.

Liability for supervising officials under Section 1983 occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between the actions of the supervising official and the alleged constitutional violation of a subordinate. *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999). There can be no supervisory liability without an underlying constitutional violation. *Knight ex rel. Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 821 (11th Cir. 2017).

---

[31] Because the Court has found no underlying constitutional violation, the Court need not evaluate the merits of Defendants' arguments that they did not violate clearly established law.

[32] The Court is skeptical that Plaintiff's Complaint alleges a supervisory liability claim at all. (Doc. 1 ¶¶ 27-29). Despite this, Defendants seem to be under the impression that Plaintiff alleges a supervisory liability claim, as evidenced by the arguments in their brief that they are entitled to summary judgment on that claim. Although Plaintiff, at the pleading stage, did not articulate a supervisory liability claim with enough specificity to put Defendants, or the Court, on notice that they were pursuing such a claim, Defendants' failure to make a formal motion to dismiss such a claim, and subsequent acknowledgement of that claim in their brief, leaves the Court no choice but to address any supervisory liability claim on its merits.

The Court, as discussed above, has found as a matter of law that no Defendant participated personally in a constitutional violation. The question, therefore, is whether Plaintiff can establish a "causal connection" between the actions of any of the Defendants and a constitutional violation. The Court will address whether supervisory liability exists for Defendant Bryant; and then Defendants Nisen and Starling.

### a.   Defendant Bryant

Defendant Bryant, as a unit manager, is responsible for providing "administration and management level guidance to prison staff." (Doc 38-5 ¶ 3). Defendant Bryant, therefore, has supervisory authority over some staff at VSP. But she does not "have authority to instruct medical providers who to treat and not to treat, or what treatments to provide or not provide." (Doc. 38-5 ¶ 7). As a result, there is no basis for supervisory liability against Defendant Bryant for the actions of any of the VSP medical staff, only for staff she supervises. *See Carey v. Ga. Dep't of Corr.*, No. 1:20-cv-02235-SDG, 2023 WL 2763134, at *4 (N.D. Ga. 2023) (granting summary judgment because a prison warden had no supervisory authority over medical staff against whom Plaintiff alleged Eighth Amendment violations, and there was not sufficient evidence that any staff who he supervised committed a constitutional violation). Plaintiff has not alleged any constitutional violation against an official that Defendant Bryant has supervisory authority over. (*See* Doc. 1). Accordingly, the Court finds, as a matter of law, that there is no basis for supervisory liability against Defendant Bryant, and Defendants' Motion for Summary Judgment is, therefore, **GRANTED** with respect to any supervisory liability claim against Defendant Bryant if any, and to the extent alleged.

### b.   Defendants Nisen and Starling

Defendants Nisen and Starling are both charge nurses at VSP, which means they both have supervisory authority over nurses who provide medical care at VSP, and the Court can find no evidence in the Record nor has Plaintiff alleged that that one exercises supervisory authority over the other. (*See* Docs. 38-6 & 38-7). There is no basis for supervisory liability against Defendants Nisen and Starling for two reasons.

First, Plaintiff has failed to allege, or to provide evidence in the record, which establishes that any VSP employee that Defendants Nisen and Starling exercise supervisory authority over committed a constitutional violation. And second, even to the extent that some

constitutional violation might have been committed by an official not named in the lawsuit, Defendants Nisen and Starling's conduct does not meet the standard that would be required to show a causal connection. To establish such a connection, a Plaintiff would have to establish one of the following things: (1) a history of widespread abuse that put the responsible supervisor on notice of the need to correct the alleged violation and the supervisor failed to do so, (2) the supervisor directed subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so, or (3) the supervisor adopted an improper custom or policy that lead to the deliberate indifference. *Hartley*, 193 F.3d 1263, 1269 (11th Cir. 1999). Here, the Record is bereft of evidence that could establish a causal connection between Defendants Nisen or Starling's actions and a constitutional violation. Accordingly, the Court finds, as a matter of law, that there is no basis for supervisory liability against Defendants Nisen and Starling and Defendants' Motion for Summary Judgment is therefore **GRANTED** with respect to any supervisory liability claim against Defendants Nisen and Starling if any, and to the extent alleged.

## IV. CONCLUSION

For the foregoing reasons, Defendant Delisha Bryant, Pamela Nisen, and Tina Starling's Motion for Summary Judgment (Doc. 38) is **GRANTED**.

In more detail, (1) Defendants' Motion for Summary Judgment is **GRANTED** with respect to Plaintiff's Deliberate Indifference to Serious Medical Needs claim against Defendant Bryant; (2) Defendants' Motion for Summary Judgment is **GRANTED** with respect to Plaintiff's Deliberate Indifference to Serious Medical Needs claim against Defendants Nisen and Starling; (3) Defendants' Motion for Summary Judgment is **GRANTED** with respect to any supervisory liability claim against Defendant Bryant if any, and to the extent alleged; and (4) Defendants' Motion for Summary Judgment is **GRANTED** with respect to any supervisory liability claim against Defendants Nisen and Starling if any, and to the extent alleged. It is further **ORDERED AND ADJUDGED** that Plaintiff Willie Winters shall take nothing by his Complaint against Defendants Delisha Bryant, Pamela Nisen, or Tina Starling and that judgment be entered in the Defendants' favor and against Plaintiff.

**SO ORDERED**, this 15th day of November 2023.

<u>/s/ W. Louis Sands</u>
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**